JUDGE MARRERO

09 CV 7843

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

ESPACE INC.,

               Plaintiff,

    - against -

PT UNITRADA KOMUTAMA and
NITRACOM INTERNATIONAL PTE LTD.,

               Defendants.

-------------------------------------------------------X

09 Civ.

ECF CASE

RECEIVED
SEP 11 2009
U.S.D.C. S.D.N.Y.
CASHIERS

## VERIFIED COMPLAINT

Plaintiff, ESPACE INC. (hereinafter "Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the Defendants, PT UNITRADA KOMUTAMA ("Unitrada") and NITRACOM INTERNATIONAL PTE LTD. (hereinafter "Nitracom") (collectively referred to as "Defendants") alleges, upon information and belief, as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the breach of maritime contract of charter. This matter also arises under the Court's federal question jurisdiction within the meaning of 28 United States § 1331 and the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et seq.*) and/or the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

2.      At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity organized and existing under the laws of the Marshall Islands.

3.      Upon information and belief, Defendants Unitrada and Nitracom were, and still are, foreign corporations, or other business entities organized and existing under foreign law.

4.     Upon information and belief, Defendant Nitracom was, and still is a trade name, alias, alter-ego, paying agent, receiving agent, and/or joint venturer of Defendant Unitrada who is now, or will soon be, holding assets/property belonging to Unitrada.

5.     At all times material to this action, Plaintiff was the owner of the motor vessel "MV GAS SOPHIE" (hereinafter the "Vessel").

6.     By a Fixture Recap dated May 19, 2009 incorporating the terms of the ASBATANKVOY form charter party (hereinafter "Charter Party"), Plaintiff voyage chartered the Vessel to Unitrada and/or Nitracom for the carriage of cargo from one safe load port in Zhuhai, China to one safe discharge port in Haipong, Vietnam. *A copy of the Charter Party is annexed hereto as Exhibit "1."*

7.     Pursuant to the terms of the Charter Party, Plaintiff delivered the Vessel into the service of Unitrada and/or Nitracom and has at all times fully performed its duties and obligations under the Charter Party.

8.     The Charter Party provides for payment of demurrage[1] at the rate of $7,500.00 per day, pro rata.

9.     During the course of loading and discharging, Unitrada and/or Nitrcom exceeded the amount of laytime[2] provided for under the Charter Party resulting in demurrage charges for Unitrada's account. *A copy of the Time Sheet is annexed hereto as Exhibit "2."*

10.     Disputes arose between the parties regarding Unitrada's and/or Nitracom's failure to pay the demurrage due and owing under the Charter Party.

---

[1]     Demurrage is a fixed sum, per day or per hour, agreed to be paid for the detention of the vessel under charter at the expiration of laytime allowed.
[2]     Laytime refers to the time allowed by the shipowner to the voyage charterer in which to load and/or discharge the cargo.

11.     Unitrada and/or Nitracom breached the terms of the Charter Party by failing to pay demurrage due and owing to Plaintiff in the total amount of $45,786.46.  *See Invoice annexed hereto as Exhibit "3."*

12.     Pursuant to the terms of the Charter Party, disputes between the parties are to be submitted to arbitration in London with English law to apply.

13.     Plaintiff will initiate arbitration on its substantive claims in London after the commencement of this action and jurisdiction is obtained over Defendant(s).

14.     Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law.  Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of these items as part of an award in favor of the prevailing party.

15.     As best as can now be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing party:

| | | | |
|---|---|---|---|
| a. | Plaintiff's principal claim: | $ | 45,786.46 |
| b. | Interest:<br>1 year at 8% compounded quarterly | $ | 3,774.28 |
| c. | Estimated recoverable fees and costs: | $ | 15,000.00 |
| **Total:** | | **$** | **64,560.74** |

16.     Upon information and belief, Defendant Unitrada is the alter-ego of Defendant Nitracom because it dominates and disregards Nitracom's corporate form to the extent that Unitrada is actually carrying on Nitracom's business and operations as if the same were its own, or vice versa.

17.     Upon information and belief, Defendant Nitracom is a shell-corporation and or pass through company through which Defendant Unitrada conducts its business, or vice versa.

3

18.    Upon information and belief, Defendant Nitracom has no separate, independent identity from Defendant Unitrada.

19.    Upon information and belief, Nitracom makes payments on Unitrada's behalf where Nitracom in disregard of the companies' separate corporate forms.

20.    Upon information and belief, Nitracom made a payment to Plaintiff under the subject Charter Party. *See wire remittance details showing payment by Nitracom for Unitrada's debt annexed hereto as Exhibit "4."*

21.    Upon information and belief, Unitrada structures its payments in this way so that it can insulate itself from creditors relating to its commercial obligations and in particular its vessel charters.

22.    It is not general practice in the maritime community, nor any where else, for independent companies to make or receive large payments on behalf of other independent companies.

23.    Payments sent or received on behalf of another independent company are suggestive of a relationship that is not "arms length."

24.    In addition to having Nitracom make payments on its behalf, Plaintiff was instructed to issue invoices in relation to the Charter Party to Defendant Nitracom, although Unitrada was the only party referenced in the Charter Party.

25.    Based on the above, there is commingling of funds between and among the Defendants.

26.    In addition, upon information and belief, among the Defendants, there is a commonality of control and management.

4

27.    Upon information and belief, Defendants are both members of the Unitrada Group of companies.

28.    In addition, although Unitrada was listed as the charterer in the charter party, in communications regarding the subject charter, Nitracom is referenced as the charterer.

29.    Based on the foregoing, as well as other activities, Defendants Unitrada and Nitracom should be considered as a single economic unit with no corporate distinction between or among them, rendering each liable for the debts of the other, and all assets of Nitracom susceptible to attachment and/or restraint for the debts of Unitrada, and vice versa.

30.    By virtue of the foregoing, Nitracom is properly considered a party to the subject Charter Party as a trade name, alias, alter ego, and/or paying agent of Defendant Unitrada.

31.    In the alternative, Defendants are partners and/or joint venturers such that Nitracom is now, or will soon be, holding assets belonging to Unitrada, or vice versa.

32.    In the further alternative, Defendants are affiliated companies such that Nitracom is now, or will soon be, holding assets belonging to Unitrada, or vice versa.

33.    In the further alternative, Defendant Unitrada was, and still is, Nitracom's agent, such that Nitracom was the actual charterer of the Vessel under the subject Charter Party, and thus is directly liable for Plaintiff's claim as set forth herein.

34.    The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendants. *See Affidavit in Support of Prayer for Maritime Attachment annexed hereto as Exhibit "5."*

35.    The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendants held by any garnishee(s) within the District for the purpose of obtaining personal jurisdiction over the Defendants, and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.    That the Court retain jurisdiction to compel the Defendants to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

C.    That pursuant to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et seq.*), the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*) and/or the doctrine of comity this Court recognize, confirm and enforce any final arbitration award and/or judgment rendered on the claims had herein as a Judgment of this Court;

D.    That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee within the District which are due and owing to the Defendants in the amount **$64,560.74** calculated to date to secure the Plaintiff's claims, and that all persons

claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

      E.     That in the alternative, this Court enter judgment against the Defendants on the claims set forth herein;

      F.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

      G.     That this Court award Plaintiff its attorney's fees and costs of this action; and

      H.     That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated: September 11, 2009

The Plaintiff,
ESPACE INC.

By: _____
Darin L. Callahan
Nancy R. Siegel
Patrick F. Lennon
LENNON, MURPHY & LENNON, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 -- phone
(212) 490-6070 -- fax
dlc@lenmur.com
nrs@lenmur.com
pfl@lenmur.com

## ATTORNEY'S VERIFICATION

1.      My name is Darin L. Callahan.

2.      I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.      I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the Plaintiff.

4.      I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.      The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.      The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.      I am authorized to make this Verification on behalf of the Plaintiff.

Dated:          September 11, 2009

Darin L. Callahan

8

# EXHIBIT "1"

**Anastasatou Hara**

| | |
|---|---|
| **From:** | Krohn-Hansen Christian |
| **Sent:** | Τρίτη, 1 Σεπτεμβρίου 2009 2:01 μμ |
| **To:** | Legal Dept; Insurance & Claims Dept |
| **Cc:** | Stockley David; Operation Dept (Stealth); Triantafyllidis Christos; Vafias Harry |
| **Subject:** | FW: RE: Gas Sophie / Nitracon CP dd 18.05.09 (REF:094BC4600) |
| | |
| **Importance:** | High |

Pls find below recap of fixture for the Gas Sophie with PT Unitrada Komutama
(Nitracom) in order to start legal proceeding for the dem claim.

Brgds
C


>----- Original Message -----

>From:"David K. Wilson" <dkw@fearnleys.sg> To  :"'charter@stealth.gr'"
><charter@stealth.gr>; Cc  :mark_sing_gas <gas.old@fearnleys.com.sg>;
>Sent: Tue, 19 May 2009 11:37:41 +0200
>Subj: RE: Gas Sophie / Nitracon CP dd 18.05.09

Christian / David

AMENDED Chtrs name

Pleased to recap clean fixture on the below terms and conditions:-

Contract:
One voyage

Charterers :
PT. Unitrada Komutama

Owners:
Espace Inc

Vessel:
LPG/C Gas Sophie

Cargo/Qtty:
1800mts at 5% MOLOO

Lay/can:
21/23 May 2009

Loading port:
OSPB Zhuhai, China

Disport:
OSPB Haipong, Vietnam

Freight:
USD32.50 PMT
Frt payable before discharge of cargo

Laytime:
Total 60 hours SHINC with 6 NOR each port unless used. The vessel is not to tender NOR
before the commencement of the laycan without Chtrs permission. Any time saved by
loading before the laycan is to be credited to total laytime.

Demurrage:
USD 7,500.00 PDPR

Last cargo:
LPG

1

Presentation:
Vessel shall be presented with her cargo tanks under last cargo vapours with liquids free.

Cargo temperature clause:
The cargo shall be loaded and discharged at ambient temperature always above zero (0) degree centigrade at the vessel's manifolds.

Cargo shortage clause
The Owner and the vessel/master will not to be held responsible by Charterers and/or receiver/supplier, nor accountable for the cargoes remaining aboard the vessel in the form of vapour after discharging all the liquid cargoes. Should the vessel's fault be proven to lose cargoes during its steaming to the discharge port(s) for more than 0.5% of the ship's figure intake quantity after loading against the ship's figure outturn quantity before discharging. The shortage in excess of 0.5% of the difference (if any) should be compensated at a sum of the proven FOB price and freight.

Lawful Merchandise clause
The Vessel shall be employed in carrying lawful merchandise and the Charterer shall undertake not to ship any smuggling cargo.  In the event that any cargo or goods are smuggled or any governments, governmental agencies, customs or any other authorities deem the cargo or goods as smuggling, the Charterer shall hold the Owner harmless against any and all consequences, losses, damages, fines, expenses, claims and liabilities arising from or in any way connected with the smuggling or any such event.

- Agents: Owners BENDS

    If the vessel arrives and tenders notice of readiness after the time of the last pilot available and therefore unable to reach discharging berth on arrival due to port authority/pilot restrictions on shifting after dark, time waiting for pilot till 0800 hours next morning shall not count as used laytime unless already on demurrage.

- CONOCO weather clause
Delays in berthing for loading or discharging and any delays after berthing which are due to weather conditions shall count as one-half laytime or, if on demurrage, at one half demurrage rate.

- LOI
In case original B/L is not available before vessel's arrival at discharge port, owners/vessel is not entitled to discharge/release the cargo unless Charterer issue LOI with owners PNI wording.

- P & C clause
Both parties shall keep any information about the deal private and confidential.

.- BIMCO ISPS clause to apply

- C/P form, Law and Litigation clause
ASBATANKVOY Charter Party, logical amendments are made for gas product.
York Antwerp Rules 1974, amended 1990 shall be applied.
General average and arbitration, if any, shall be finally settled in London in accordance with English law

- Commission
2pct on f/d/d to Fearngas (S) Pte Ltd, for which we thank you.

stop

Brgds
David Wilson

>----- Original Message End -----

2

Association of Ship Brokers
& Agents (U.S.A.), Inc.

October 1977

CODE WORD FOR THIS
CHARTER PARTY:

ASBATANKVOY

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

Place                    Date

IT IS THIS DAY AGREED between

chartered owner/owner (hereinafter called the "Owner") of the

SS/MS                                                   (hereinafter called the "Vessel")

and                                                      (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

## PART I

A.  Description and Position of Vessel:

    Deadweight:      tons (2240 lbs.)   Classed:

    Loaded draft of Vessel on assigned summer freeboard    ft.    in. in salt water.

    Capacity for cargo:      tons (of 2240 lbs. each)    % more or less, Vessel's option.

    Coated:    [ ] Yes    [ ] No

    Coiled:    [ ] Yes    [ ] No    Last two cargoes:

    Now:        Expected Ready:

B.  Laydays:

    Commencing:      Cancelling:

C.  Loading Port(s):

                                 Charterer's Option

D.  Discharging Port(s):

                                 Charterer's Option

E.  Cargo:

                                 Charterer's Option

F.  Freight Rate:                          per ton (of 2240 lbs. each).

G.  Freight Payable to:                      at

H.  Total Laytime in Running Hours:

I.  Demurrage per day:

J.  Commission of      % is payable by Owner to

    on the actual amount freight, when and as freight is paid.

K.   The place of General Average and arbitration proceedings to be London/New York (strike out one).

L.   Tovalop: Owner warrants Vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.

M.   Special Provisions:


IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness the signature of:

                                                            By:



Witness the Signature of:

                                                            By:

This Charterparty is a computer generated copy of ASBATANKVOY form, printed under license from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited. It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted as having been made by the licensee or end user as appropriate and not by the author.

## PART II

1. **WARRANTY - VOYAGE - CARGO.** The vessel, classed as specified in Part II hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pumps, pumprooms and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat), from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2. **FREIGHT.** Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. **DEADFREIGHT.** Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. **NAMING LOADING AND DISCHARGE PORTS.**

   (a)   The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

| | On a voyage to a port or ports in: |
|---|---|
| ST. KITTS | Caribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) |
| | (from ports west of Port Said.) |

   (b)   If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| Place | On a voyage to a port or ports in: |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) |
| | or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTAR | Mediterranean (from Western Hemisphere). |

   (c)   Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

5. **LAYDAYS.** Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6. **NOTICE OF READINESS.** Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice or readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7. **HOURS FOR LOADING AND DISCHARGING.** The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharge of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. **DEMURRAGE.** Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9. **SAFE BERTHING - SHIFTING.** The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lightenage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10. **PUMPING IN AND OUT.** The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore time lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into the Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11. **HOSES: MOORING AT SEA TERMINALS.** Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. **DUES - TAXES - WHARFAGE.** The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at La Havre and Portuguese Imposto de Consento Maritimo. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a)   **CARGOES EXCLUDED VAPOR PRESSURE.** Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100 deg F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

   (b)   **FLASH POINT.** Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115 deg F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14. (a)   **ICE.** In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

   (b)   If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15. **TWO OR MORE PORTS COUNTING AS ONE.** To the extent that the freight rate standard of reference specified in Part I hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the

following conditions:

   (a)   Charterer shall pay freight at the highest rate payable under Part 1 F hereof for a voyage between the loading and discharge ports used by Charterer.

   (b)   All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

   (c)   Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

   (d)   Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16.   GENERAL CARGO.  The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause 1.

17.   (a).   QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterers shall not be liable for any resulting delay.

   (b)   FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or steam/oil-free, she shall, before proceeding to a rat-free or steam/oil-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18.   CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19.   GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:- any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy or marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner. And neither the Vessel nor Master or owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from:- Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20.   ISSUANCE AND TERMS OF LADING.

   (a)   The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

   (b)   The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

   (i)   CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading, at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

   (ii)   JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

   (iii)   GENERAL AVERAGE shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made as security to any General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

   (iv)   BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.

   (v)   LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

   (vi)   WAR RISKS.   (a)   If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

   (b)   If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge - the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited. If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

   (c)   The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nation under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

   (vii)   DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21.   LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22.   AGENTS. The Owner shall appoint Vessel's agents at all ports.

23.  BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.
24.  ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city abovementioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.
25.  SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfilment of this Charter in all its terms and conditions.
26.  OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.
Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.
If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.
The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.
The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

## BILL OF LADING

Shipped in apparent good order and condition by

on board the                                                                   Steamship/Motorship

whereof                                                                        is Master, at the port of

to be delivered at the port of
or so near thereto as the Vessel can safely get, always afloat, unto

or order on payment of freight at the rate of

This shipment is carried under and pursuant to the terms of the contract/charter dated New York/London

between                                              and                                              , as Charterer, and

all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.
In witness whereof the Master has signed                                                                   Bills of Lading
of this tenor and date, one of which being accomplished, the others will be void.
Dated at                                              this                    day of

                                                                                                                          Master

This Charter Party is a computer generated copy of the ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by striking out of original characters, or the insertion of new characters, such characters clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

# EXHIBIT "2"

| Vessel: | **GAS SOPHIE** | | C/P Date: 18May2009 | C/P Form: | ASBATANKVOY |
| To: | PT UNITRADA KOMUTAMA | | | | |
| Load/Disch Ports: | ZHUHAI / HAIPHONG | | | | |
| Calculation Bss: | Reversible    - All Ports | | | Demurrage Clause: Once on Demurrage Always on Demurrage | |

| Loading at: | **ZHUHAI** | | | Arrival: 20 May 2009 20:42 | Berthed: 28 May 2009 13:48 |
| NOR Tendered: | 21 May 2009 00:01  NOR Accepted  28 May 2009 16:00 | | | | |
| Cargo: | LPG MIXTURE  1,800.000  MTN | | | | |
| Rate: | - TIME | | Dem./Desp. Rate: | 7,500.00 | / |
| Excempted Period: | - - - - | | | Loading Commenced: | 27 May 2009 00:45 |
| Laytime counts From: Thu 21May09 06:01 | | Until: | Wed 27May09 05:25 | Loading Completed: | 27 May 2009 05:05 |

| | | | | | | Remarks |
|---|---|---|---|---|---|---|
| Thu, 21May09 | 06:01 | 24:00 | 100.00 | 17:59 | 17:59 | FULL/NORMAL | |
| Fri, 22May09 | 00:00 | 11:12 | 100.00 | 11:12 | 1D 05:11 | FULL/NORMAL | |
| | 11:12 | 12:05 | 0.00 | 00:00 | 1D 05:11 | NOT TO COUNT | INWARD PASSAGE |
| | 12:05 | 24:00 | 100.00 | 11:55 | 1D 17:06 | FULL/NORMAL | |
| Sat, 23May09 | 00:00 | 18:54 | 100.00 | 18:54 | 2D 12:00 | FULL/NORMAL | |
| | 18:54 | 24:00 | 100.00 | 05:06 | 2D 17:06 | FULL/NORMAL | Vessel On Demurrage at 1854 |
| Sun, 24May09 | 00:00 | 24:00 | 100.00 | 1D 00:00 | 3D 17:06 | FULL/NORMAL | |
| Mon, 25May09 | 00:00 | 24:00 | 100.00 | 1D 00:00 | 4D 17:06 | FULL/NORMAL | |
| Tue, 26May09 | 00:00 | 24:00 | 100.00 | 1D 00:00 | 5D 17:06 | FULL/NORMAL | |
| Wed, 27May09 | 00:00 | 05:25 | 100.00 | 05:25 | 5D 22:31 | FULL/NORMAL | |

| Time Remaining All Ports | 2D 12:00 |
|---|---|
| Time Used: | 5D 22:31 |
| Time Remaining: | 0D 00:00 |

| Vessel: | **GAS SOPHIE** | C/P Date: 18May2009 | C/P Form: | **ASBATANKVOY** |
|---|---|---|---|---|
| To: | **PT UNITRADA KOMUTAMA** | | | |

Load/Disch Ports: ZHUHAI / HAIPHONG
Calculation Bss:  Reversible    - All Ports                          Demurrage Clause:Once on Demurrage Always on Demurrage

| Discharging at: | **HAIPHONG** | | Arrival: 28 May 2009 23:55 | Berthed: 30 May 2009 23:54 |
|---|---|---|---|---|
| NOR Tendered: | 28 May 2009 23:55   NOR Accepted  31 May 2009 01:00 | | | |
| Cargo: | LPG MIXTURE  1,828.500 MTN | | | |
| Rate: | - TIME | Dem./Desp. Rate: | 7,500.00       / | |
| Excempted Period: | - - - - | | Discharging Commenced: 31 May 2009 01:55 | |
| Laytime counts From: *Fri 29May09 05:55* | | Until:   *Sun 31May09 21:55* | Discharging Completed:  31 May 2009 21:30 | |

| | | | | | | Remarks |
|---|---|---|---|---|---|---|
| Fri, 29May09 | 05:55 | 24:00 | 100.00 | *18:05* | 18:05 | FULL/NORMAL |
| Sat, 30May09 | 00:00 | 24:00 | 100.00 | *1D 00:00* | 1D 18:05 | FULL/NORMAL |
| Sun, 31May09 | 00:00 | 21:55 | 100.00 | *21:55* | 2D 16:00 | FULL/NORMAL |

| Time Remaining All Ports | -3D -10:-31 | | |
|---|---|---|---|
| Time Used: | 2D 16:00 | | |
| Time Remaining: | 0D 00:00 | | |
| Total Time Allowed for all Ports | 2D  12:00 | | |
| Total Time Used | 8D  14:31 | | |
| Total Time Lost: | 6D   02:31 | Demurrage due:   6.104861 D at   7,500.00  /Day   45,786.46 | |

EXHIBIT "3"

# ESPACE INC.

TRUST COMPANY COMPLEX  AJELTAKE ISLAND  AJELTAKE ROAD
96960 M.H
Majuro MARSHALL ISLANDS

**VESSEL:** GAS SOPHIE **CHARTERER:** NITRACOM  **C/P DATE:** 18-May-09

**DEMURRAGE INVOICE**

Messrs

NITRACOM INTERNATIONAL PTE LTD
138 CECIL STREET # 07-04 CECIL COURT
SINGAPORE

Loaded:    ZHUHAI
Discharged:    HAIPHONG

**Inv  No. D-V0609**                              Date 09-Jun-09

| DESCRIPTION | | AMOUNT US$ | |
|---|---|---|---|
| **Demurrage  ()** | | | |
| 6.104861    Days | @7,500.00    Per Day | $45,786.46 | |
| Total amount | | $45,786.46 | $0.00 |
| Balance Due | | | $45,786.46 |

Demurrage is payable as per charter party to:

EFG EUROBANK ERGASIAS
75  AKTI MIAOULI STREET
PIRAEUS - GREECE
SWIFT CODE: EFGBGRAA
TEL: 45 87 840, FAX: 45 87 856
INTO ACCOUNT NR: 0026 0029 21 1200222114
IBAN: GR3702600290000 211200222114
IN FAVOUR OF: STEALTHGAS INC

CORR. BANK: DEUTSCHE BANK COMPANY AMERICAS NY
NEW YORK -USA
SWIFT ADDRESS: BKTRUS33

Nikos Markomichelakis
Operations Manager

Perpinias Kyriakos
Freight Collection Dpt

EXHIBIT "4"

EUROBANK BR. 029    ☑ 001/001

File Name:    E:\FILES\IN\BACKUP\09522160701G01   *Direction*   IN
              04.DAT

```
{1:F01EFGBGRAAAXXX5672621721}{2:O1030843090522SCBLUS33AXXX7865220159090522160701G01 08:2009052200051414}}{4:
:20:2009052200051414
:23B:CRED
:32A:090522USD58480,
:33B:USD58500,
:50K:/0379005727
NITRACOM INTERNATIONAL PTE LTD
138 CECIL STREET  07 04 CECIL COURT
SINGAPORE 069538
:52D:/3582088503001
STANDARD CHARTERED BANK
MAXWELL ROAD
SINGAPORE
:53A:BKTRUS33
:59:/00260029211200222114
STEALTHGAS INC
GR3702600290000211200222114
:70:/RFB/0500T09052201364
PAYMENT OF INV NO F V0609
:71A:SHA
:72://ACC/75 AKTI MIAOULI STREET PIRAEUS
//GREECE
-}{5:{MAC:00000000}{CHK:28F62C33BC7E}}{S:{SAC:}{COP:P}}
```

## *Notes*

---

*End of Message Print*

EXHIBIT "5"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ESPACE INC.,                                            :
                                                        :
                              Plaintiff,                :    09 Civ. _____
                                                        :
          - against -                                   :    ECF CASE
                                                        :
PT UNITRADA KOMUTAMA and                                :
NITRACOM INTERNATIONAL PTE LTD.,                        :
                                                        :
                              Defendants.               :
-------------------------------------------------------------X

### AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut   )
                       )        ss:  Town of Southport
County of Fairfield    )

Nancy R. Siegel, being duly sworn, deposes and says:

1.     I am a member of the Bar of this Court and represent the Plaintiff herein.  I am familiar with the facts of this case and make this Affidavit in support of Plaintiff's prayer for the issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

### DEFENDANTS ARE NOT PRESENT IN THE SOUTHERN DISTRICT OF NEW YORK

2.     I have attempted to locate the Defendants, PT UNITRADA KOMUTAMA and NITRACOM INTERNATIONAL PTE LTD., within the Southern District of New York.  As part of my investigation to locate the Defendants within the Southern District of New York, I checked the telephone company information directory, as well as the white and yellow pages for New York listed on the Internet or World Wide Web, and did not find any listing for the Defendants.

Finally, I checked the New York State Department of Corporations' online database which showed no listings or registration for the Defendants.

      3.     I submit based on the foregoing that the Defendants cannot be found within the Southern District of New York within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

      4.     Upon information and belief, the Defendants have, or will have during the pendency of this action, tangible and intangible property within the Southern District of New York and subject to the jurisdiction of this Court, held in the hands of in the hands of garnishees within the Southern District of New York, which are believed to be due and owing to the Defendants.

      5.     This is Plaintiff's first request for this relief made to any Court.

## PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER

      6.     Plaintiff seeks an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy Siegel, Colleen McEvoy, Anne C. LeVasseur or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, in addition to the United States Marshal, to serve the Ex Parte Order and Process of Maritime Attachment and Garnishment, together with any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiff) may hold assets of, for or on account of, the Defendants.

      7.     Plaintiff seeks to serve the prayed for Process of Maritime Attachment and

2

Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiff and entered against the Defendants.

8.      To the extent that this application for an Order appointing a special process server with respect to this attachment and garnishment does not involve a restraint of physical property, there is no need to require that the service be effected by the Marshal as it involves simple delivery of the Process of Maritime Attachment and Garnishment to the various garnishees to be identified in the writ.

## PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

9.      Plaintiff also respectfully requests that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendants, within the Southern District of New York.  Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

## PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

10.      Further, in order to avoid the need to repetitively serve the garnishees/banks, Plaintiff respectfully seeks further leave of the Court, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service of process throughout any given day on which process is served through the next day, provided that process is served the next day, and to authorize service of process via facsimile or e-mail following initial *in personam* service.

Dated:      September 11, 2009
              Southport, CT

_____
Nancy R. Siegel

Sworn and subscribed to before me
this 11th day of September, 2009

_____
NOTARY PUBLIC

Mary E. Fedorchak
Notary Public-Connecticut
My Commission Expires
November 30, 2011